IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEPHEN D. PATTERSON,          )
                               )
         Plaintiff,            )
                               )
    vs.                        ) Civil Action No. 05-1512
                               )
COMMISSIONER OF SOCIAL         )
SECURITY,                      )
                               )
         Defendant.            )

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Stephen D. Patterson, seeks judicial review of a decision of defendant, Commissioner of Social Security ("the Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Presently before the Court are the parties' cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, plaintiff's motion for summary judgment will be denied and the Commissioner's cross-motion for summary judgment will be granted.

### II. Background

#### A. Procedural History

Plaintiff filed his first application for DIB on July 5, 1994, alleging disability since April 5, 1993 due to dizziness,

1

cervical radiculopathy and myofascial pain syndrome.[1]  (R. 54-57,

75).  Plaintiff's application was denied initially and upon

reconsideration.  (R. 58-74).  On January 18, 1995, plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"),

and the hearing was held before ALJ Newton Greenberg on May 14,

1996.  Plaintiff, who was represented by counsel, testified at

the hearing.  (R. 38-53, 67-69, 75-76).

On May 22, 1996, ALJ Greenberg issued a decision denying

plaintiff's application for DIB.  (R. 12-18).  Specifically, ALJ

Greenberg concluded that, although plaintiff was unable to

perform his past relevant work as a coal miner and a welder, he

retained the residual functional capacity ("RFC") to perform the

full range of sedentary work.[2]  Therefore, he was not disabled

_____

[1]In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage in
any substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
42 U.S.C. § 423(d)(2)(A).

[2]RFC is the most a disability claimant can still do despite
his or her limitations, 20 C.F.R. § 404.1545(a), and sedentary
work "involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files,
ledgers, and small tools.  Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties.  Jobs are
sedentary if walking and standing are required occasionally and

under the Social Security Act.  (R. 17-18).  On June 17, 1996, plaintiff requested review of ALJ Greenberg's decision.  (R. 6). However, on January 7, 1997, the Appeals Council denied his request.  (R. 4-5).

Plaintiff appealed the decision denying his first application for DIB to this Court, and, on January 31, 1997, the case was assigned to former United States District Court Judge Donald J. Lee and referred to former United States Magistrate Judge Kenneth J. Benson ("MJ Benson") for pretrial proceedings (Civil Action No. 97-183).  The parties filed cross-motions for summary judgment, and, on October 7, 1997, MJ Benson issued a Report and Recommendation recommending that plaintiff's motion for summary judgment or, in the alternative, for remand be denied and that the Commissioner's motion for summary judgment be granted.  (R. 710-18).  On November 5, 1997, Judge Lee adopted MJ Benson's Report and Recommendation as the opinion of the Court.

On January 22, 1998, plaintiff filed another application for DIB, again alleging disability since April 5, 1993 despite his failure to file an appeal from Judge Lee's decision with respect to his first application for DIB.  (R. 298-300).  Plaintiff's second application was denied initially and upon reconsideration. (R. 277-89).  On May 7, 1998, plaintiff filed a request for a

---

other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

hearing before an ALJ.  (R. 290-92).  On March 5, 1999, however, ALJ Karl Alexander, the ALJ to whom plaintiff's request for a hearing was assigned, entered an order vacating the reconsideration determination and remanding the case to the State agency for further review.[3]  (R. 382-84).  Subsequently, on July 2, 1999, the Social Security Administration notified plaintiff that "[a]fter carefully reviewing all of the information, we again find that you are not disabled."  (R. 387-91).

On July 14, 1999, plaintiff filed another request for a hearing before an ALJ in connection with his second application for DIB, and, on December 9, 1999, a hearing was held before ALJ Alexander.  Plaintiff, who was represented by counsel, and Timothy Mahler, a vocational expert, testified at the hearing. (R. 244-74).  On May 19, 2000, ALJ Alexander issued a decision denying plaintiff's second application for DIB.  Specifically, ALJ Alexander determined that, although plaintiff was unable to perform the full range of light work, he retained the RFC to perform a significant number of jobs existing in the national

---

[3]Specifically, on remand, the State agency was directed to (a) obtain a psychiatric evaluation of plaintiff to determine whether he had work-related limitations due to anxiety and depression in light of a November 6, 1998 letter to plaintiff's counsel from his treating therapist at Chestnut Ridge Counseling Services, Inc. (R. 380-81); (b) order the completion of a Psychiatric Review Technique Form for plaintiff; and (c) issue a new determination in connection with plaintiff's second application for DIB.

economy.[4]  Therefore, he was not disabled under the Social Security Act.[5]  (R. 220-35).

On June 1, 2000, plaintiff filed a request for review of ALJ Alexander's decision.  (R. 216).  However, the request for review was denied by the Appeals Council on October 3, 2000.  (R. 214-15).  On October 26, 2000, plaintiff filed an appeal from the second adverse decision with this Court and the case was assigned to Judge Lee (Civil Action No. 00-2100).  After the filing of plaintiff's motion for summary judgment, the Commissioner filed a motion to remand.  Judge Lee granted the Commissioner's motion to remand and the case was closed on June 27, 2001.  Thereafter, on September 6, 2001, the Appeals Council entered an order vacating ALJ Alexander's May 19, 2000 decision and remanding for a further hearing in light of ALJ Alexander's conflicting findings with

---

[4]Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities...."  20 C.F.R. § 404.1567(b).

[5]In his decision, ALJ Alexander noted that the denial of plaintiff's July 5, 1994 application for DIB was res judicata with respect to the issue of disability from April 5, 1993 (the onset date of disability alleged in both the July 5, 1994 and the January 22, 1998 applications for DIB) to May 22, 1996 (the date of the first unfavorable determination).  (R. 221).  Thus, the applicable onset date of disability for purposes of ALJ Alexander's ruling on plaintiff's second application for DIB was May 23, 1996.

respect to the severity of plaintiff's mental limitations.[6]  (R. 548-49).

A further hearing before ALJ Alexander was held on January 31, 2002.  Plaintiff, who was represented by counsel, testified again.  A vocational expert, Larry Bell, also testified.  (R. 527-47).  On July 23, 2002, ALJ Alexander again issued an adverse decision.  Specifically, ALJ Alexander determined that, although plaintiff was unable to perform the full range of light work, he retained the RFC to perform a significant number of light and sedentary jobs existing in the national economy.  Accordingly, plaintiff was not disabled under the Social Security Act.  (R. 514-25).

On October 2, 2002, plaintiff filed an appeal from ALJ Alexander's second adverse decision with this Court (Civil Action No. 02-1680).  The case was assigned to Judge Lee and referred to former United States Magistrate Judge Ila Jeanne Sensenich ("MJ Sensenich") for pretrial proceedings.  After the filing of cross-motions for summary judgment, the parties consented to the exercise of jurisdiction by MJ Sensenich.  Thereafter, on February 11, 2004, MJ Sensenich filed an Opinion denying the

---

[6]On remand, ALJ Alexander was directed to (1) re-evaluate plaintiff's mental limitations; (2) obtain additional vocational expert testimony and, if necessary, the testimony of a medical expert who was a mental health professional; (3) provide plaintiff with an opportunity to appear at the hearing; and (4) issue a new decision.

parties' cross-motions for summary judgment and granting
plaintiff's alternative motion for a remand to allow the
Commissioner to make findings of fact regarding plaintiff's
allegation that ALJ Alexander was biased against him, his
treating physician and the Social Security Administration's
consultative psychologist.[7]  (R. 695-709).

On remand, the Appeals Council found that ALJ Alexander's
July 23, 2002 decision did not reflect bias toward plaintiff, his
treating physician or the Social Security Administration's
consultative psychologist.  Nevertheless, on April 21, 2004, the
Appeals Council entered an order vacating ALJ Alexander's July
23, 2002 decision and remanding the case to another ALJ for

---

[7]Plaintiff's claim that ALJ Alexander was biased is based on
the following: (1) with respect to the Social Security
Administration's consultative psychologist, the ALJ's statement
that he "has seen more than a few cases in the past in which Dr.
Provenzano has accepted without question the subjective
statements of claimants..."; (2) with respect to plaintiff's
treating physician, the ALJ's statement that "[i]n the current
treatment notes, Dr. Mitchell continues to re-tell the same
unsupported diagnoses, to generate reams of meaningless
boilerplate paperwork, and to run a workers' compensation mill";
and (3) with respect to plaintiff, the ALJ's statement that
plaintiff is a malingerer.

Noting that an individual seeking disability benefits has
the right to a full and fair hearing, that an unbiased judge is
essential to a fair hearing, and that a district court is
expressly prohibited under the Social Security Act from making
its own findings regarding an ALJ's alleged bias, MJ Sensenich
remanded the case for such findings by the Commissioner and
declined to address the alternative arguments raised by plaintiff
in support of his motion for summary judgment.

further proceedings, including the opportunity for plaintiff to appear at a new hearing, further development of the record and issuance of a new decision.  (R. 693-94).

A further hearing on plaintiff's second application for DIB was held before ALJ Randall Noon on November 5, 2004.  Plaintiff, who was represented by counsel, testified at the hearing.  A medical expert, L. Leon Reid, Ph.D., and a vocational expert, Timothy Mahler, also were called to testify at the hearing.  When Dr. Reid was called to testify after plaintiff, however, he indicated that further psychological testing was needed for him to render an opinion concerning the effect of plaintiff's mental impairments on his ability to work.  As a result, ALJ Noon continued the hearing and ordered further psychological testing of plaintiff.  (R. 796-851).  Following completion of the psychological testing recommended by Dr. Reid, the hearing before ALJ Noon resumed on May 25, 2005 at which time both Dr. Reid and Mr. Mahler testified.  (R. 852-76).

On August 26, 2005, ALJ Noon issued his decision, denying plaintiff's second application for DIB.  Specifically, ALJ Noon found that plaintiff retained the RFC to perform the demands of

sedentary work with certain modifications.[8]  (R. 667-83).  This appeal followed.

## B. Plaintiff's Hearing Testimony

At the hearings on his applications for DIB, plaintiff testified, in summary, as follows:

### Hearing on May 14, 1996 before ALJ Greenberg

Plaintiff's date of birth is March 24, 1956, and he has a high school education.  (R. 41).  Plaintiff resided with his wife and stepson.  (R. 43).

On April 5, 1993, during the course of his employment as a utility man in a coal mine, plaintiff sustained injuries in a bus accident while traveling to the section of the mine in which he worked.[9]  Plaintiff was taken to the hospital, x-rayed, prescribed pain medication and instructed to follow-up the next day with the company doctor, Paul T. Cullen, M.D.  Dr. Cullen

---

[8]With respect to the applicable onset date of disability, ALJ Noon noted that based on changes to the Listing of Impairments in the Social Security Regulations dealing with the musculoskeletal system which became effective in February 2002, res judicata effect could not be given to the prior hearing decision issued by ALJ Greenberg on May 22, 1996.  Therefore, the period under consideration was April 5, 1993, the date on which plaintiff claims he became disabled, to June 30, 1999, the date on which plaintiff's insured status for purposes of DIB expired. (R. 668).

[9]According to a Disability Report completed by plaintiff on July 5, 1994, his work history consists of the following jobs: (1) automobile inspection mechanic and auto body work - 1974 to 1978; (2) coal miner - 1978 to 1986; (3) welder - 1988 to 1993; and (4) coal miner - March 1993 to April 1993.  (R. 84).

approved plaintiff's absence from work for approximately three months during which plaintiff took medication and underwent a series of chiropractic manipulations and steroid injections. Plaintiff attempted unsuccessfully to return to work on one occasion while under the care of Dr. Cullen.[10]  Plaintiff then changed doctors and began treatment with William J. Mitchell, M.D.  (R. 41-42).

Plaintiff sees Dr. Mitchell once a month for evaluation of his condition and medication checks.  Although Dr. Mitchell prescribed physical therapy for plaintiff at one point, the therapy was discontinued because it did not alleviate plaintiff's pain.  (R. 42).  Dr. Mitchell has informed plaintiff that he is not a candidate for surgery; that his condition will not change; and that there is no type of work which he is capable of performing.  (R. 44).

Plaintiff experiences constant pain between his shoulder blades and occasional numbness in two fingers of his left hand. (R. 46).  On a scale of 1 (no pain) to 10 (unbearable pain), plaintiff rated his average daily pain as a 5 or 6.  The pain

---

[10]Plaintiff testified that on the one occasion when he attempted to return to work, he was only in the mine for two hours before he was compelled to stop working due to severe pain from lifting cable.  (R. 42).  Plaintiff testified further that lifting "even a gallon of milk" will cause numbness in his fingers and "sharp pains running down through my shoulder blade." (R. 47).

increases with physical activity and interferes with his ability to sleep through the night.  Plaintiff takes Darvocet and Advil to alleviate the pain.  (R. 47-48).  Due to his inability to sit or stand for long periods of time as a result of pain, plaintiff believes that he is incapable of making an adjustment to lighter, less demanding work than he performed in the mine.[11]  (R. 43).

With respect to his daily activities, plaintiff gets up between 6:00 and 7:00 a.m. and accompanies his stepson to the bus stop.  He then visits with his grandmother who is 92 years old and lives in a house that is located 30 feet from plaintiff's house.  He then goes to the Post Office to get his mail and comes home and watches movies, although he is frequently "up and down sitting and walking."  Twice a week, plaintiff accompanies his wife to the mall where he sits while she shops because he frequently gets dizzy if he walks too much.  (R. 44-45).  As to household chores, plaintiff occasionally helps his wife with the dishes.  Since the mine accident, plaintiff has been unable to do yard work, he sold his motorcycle because he could no longer ride it, and he got rid of his goats because he could no longer care for them.  During the two-week deer season in the year preceding

---

[11]In this connection, plaintiff testified that he can sit about 20 minutes before he has to stand and stretch; that he can stand for 15 minutes and that he can walk about 5 or 10 minutes before he has to sit down.  (R. 48).

the hearing, plaintiff went out four times with his sons who would have helped him if he had shot a deer.[12]  (R. 45, 49-50).

## Hearing on December 9, 1999 before ALJ Alexander

Plaintiff continued to reside with his wife and stepson in a house in Farmington, Pennsylvania.  With respect to employment history, plaintiff worked for almost 10 years in the mine before he was laid off.  He then attended vocational school, obtained a degree in welding and worked as a welder on barges for 4½ years.  Plaintiff was called back to work in the mine about a month before he sustained the back injury in the bus accident on April 5, 1993.  (R. 248-51).

Plaintiff suffers from pain between his shoulder blades which radiates into his left arm and causes numbness in his arm and two fingers.  Plaintiff continues to see Dr. Mitchell on a monthly basis for evaluations and medication checks.  Dr. Mitchell instructed plaintiff to use a cane as needed.  Plaintiff used the cane on 7 of the 10 days preceding the hearing.  For his pain, plaintiff takes Darvocet, which regularly causes sweating and dizziness, Naprelan and Advil.  Plaintiff no longer attended physical therapy because the treatment had not improved his condition.  (R. 253-56).

---

[12]In addition to a stepson, plaintiff has two sons from a previous marriage.  (R. 43).

Plaintiff sees a counselor for depression at Chestnut Ridge Counseling Services, Inc. ("CRCSI") on a monthly basis. Plaintiff was prescribed medication for his depression; however, he had to quit taking the medication because it caused severe headaches.  (R. 256-57).

On a typical day, plaintiff rises at 6:00 a.m.  He then watches television for a short period of time because he cannot sit still for very long, and drives to the Post Office, which is located a quarter of a mile from his house, to get his mail.  He then takes his stepson to the bus stop, returns home and sits "around the house mostly."  He also walks around outside a little bit because he lives in close proximity to woods.  (R. 257-58, 260).

Plaintiff's pain interferes with his ability to sleep through the night on a regular basis, and he frequently suffers from headaches.  Extreme heat and cold and humidity increase plaintiff's pain.  (R. 260, 264-65).  Plaintiff drives to some of his appointments with Dr. Mitchell, which is a distance of 24 miles roundtrip.  With respect to hobbies, plaintiff collects movies.  He can no longer hunt or fish.  His wife does "about everything" around the house.  (R. 261-63).

**Hearing on January 31, 2002 before ALJ Alexander**

Plaintiff no longer receives mental health treatment because he lacks the financial resources to pay for it.  If plaintiff

could afford the treatment, he would resume it.  Plaintiff
continues to exhibit obsessive compulsive behaviors, and he
continues to suffer from concentration and recent memory
problems.  (R. 533-36).

Plaintiff's sleep pattern is abnormal.  He is "up all hours
of the night."  Plaintiff's appetite has increased.  Plaintiff no
longer cares "about a lot of things" that he did before his
injury.  (R. 538-39).  Plaintiff continues to be treated on a
monthly basis by Dr. Mitchell, who is the person who referred
plaintiff to CRCSI for mental health treatment.  In the month
preceding the hearing, Dr. Mitchell had prescribed a TENS unit
for plaintiff.  (R. 539-41).

**Hearing on November 5, 2004 before ALJ Noon**

Plaintiff continued to reside with his wife in a single-
family, one-story home in Farmington, Pennsylvania.  None of
their children resided with them.  (R. 806-08).  The distance
between plaintiff's home and the location of the hearing was 30
to 40 miles.  Because plaintiff experiences pain if he drives too
far, plaintiff and his wife took turns driving to the hearing.
(R. 809).  Plaintiff does not shop, although he will accompany
his wife to the mall and "walk around a little bit."  (R. 811).

Plaintiff has not had surgery on his back because Dr.
Mitchell has informed him that he is not a surgical candidate.
Plaintiff's pain is located in the center of his back, and the

14

pain radiates down into his arm.  In addition, plaintiff was diagnosed with depression and obsessive compulsive disorder in June of 1998.  (R. 816-17).  He no longer receives mental health treatment, however, because he does not have insurance and cannot afford to pay for the treatment on his own.  Plaintiff has not taken any antidepressants since his treatment at CRCSI ended in 2000.  Eight months before the hearing, Dr. Achtar, plaintiff's primary care physician, prescribed Xanax for plaintiff to help him sleep.  (R. 832-33).

Plaintiff can walk about 30 yards before he has to stop and rest.  (R. 833).  Dr. Mitchell has instructed plaintiff not to lift anything weighing more than a gallon of milk.  When plaintiff sits, he "squirms" around a lot due to aching pain in his mid-back area.  He can sit longer ("probably" for an hour) if he takes his pain medication.  During the day, plaintiff frequently alternates between sitting and standing, and he takes walks around his property.  He no longer does back exercises at home.  (R. 835-38).

When asked to describe a typical day during the period he was insured for purposes of DIB,[13] plaintiff testified that he did "nothing," "just check[ed] the mail, [fed] the dogs ...

---

[13]As noted previously, plaintiff's insured status for purposes of DIB expired on June 30, 1999.  Thus, ALJ Noon focused on plaintiff's daily activities before that date.

little stuff," and that is the reason he became depressed.  (R. 818-19).  With respect to household chores, plaintiff "might" have tried to do the dishes.  As to hobbies, plaintiff tried to hunt during the period he was insured for purposes of DIB with the assistance of his sons.  However, he did not take any trips or vacations.  (R. 826-28).  Plaintiff used a cane "off and on" to walk for the six years preceding the hearing.  The cane was not prescribed by Dr. Mitchell, but when asked about using a cane by plaintiff, Dr. Mitchell said "it probably would help you a little bit."  (R. 830).  Dr. Mitchell has never referred plaintiff to a pain clinic or to another doctor for treatment for pain.  (R. 841).

## C. Expert Testimony

**Medical Expert**

L. Leon Reid, Ph.D. testified as a medical expert at the hearing before ALJ Noon on May 25, 2005.[14]  According to Dr. Reid, plaintiff has an adjustment disorder due to constant pain from his medical condition.  In light of plaintiff's pain, Dr.

---

[14]As noted previously, after plaintiff testified at the November 5, 2004 hearing before ALJ Noon, the hearing was continued when Dr. Reid indicated that further psychological testing of plaintiff was needed for him to render an opinion concerning the effect of plaintiff's mental impairments on his ability to work.  When the hearing before ALJ Noon resumed on May 25, 2005, both Dr. Reid and a vocational expert, Timothy Mahler, testified.

Reid opined that he would be "a poor candidate for dependability on the job" from a psychological standpoint.  Dr. Reid further opined that, based on plaintiff's complaints of pain which Dr. Reid found to be credible, plaintiff's mental impairment equaled the requirements of Listing 12.06 pertaining to anxiety-related disorders because plaintiff is markedly limited in social functioning and markedly limited with respect to concentration, persistence and pace.[15]  (R. 857-66).  With respect to the date on which plaintiff equaled the requirements of Listing 12.06, Dr. Reid testified that the date is February 15, 2000, when Dr. Alam of CRCSI first diagnosed plaintiff with an adjustment disorder with depressed mood.  (R. 874-75).

**Vocational Expert**

Timothy Mahler was called to provide testimony as a vocational expert at the hearing before ALJ Noon on May 25, 2005. ALJ Noon asked Mr. Mahler to assume a hypothetical person who (a) had the ability to perform light work,[16] (b) could stand or walk

---

[15]With respect to Dr. Reid's testimony that plaintiff's mental impairment equaled the requirements of Listing 12.06, as noted by ALJ Noon, this testimony is contrary to the opinion stated by Dr. Reid in a report dated May 6, 2005, which was prepared by Dr. Reid following his review of the results of plaintiff's intellectual testing by Frank K. Schmidt, Ph.D. Specifically, in his May 6, 2005 report, Dr. Reid opined that although plaintiff has an adjustment disorder due to his medical condition, the psychological evidence did not meet or equal any of the 12.00 Listings relating to Mental Disorders.  (R. 764).

[16]Mr. Mahler testified that plaintiff's past work as a utility man in a coal mine was heavy, unskilled work and his past

17

for 6 hours in an 8-hour workday, but could not stand or walk for
more than 30 minutes before he would have to sit down, (c) could
sit for 6 hours in an 8-hour workday but would have to change
positions after 30 minutes, (d) would not be able to climb
ladders, ropes or scaffolds, (e) could only occasionally engage
in postural activities such as bending and stooping; (f) would
not be able to work in temperature extremes or humid conditions,
(g) would be limited to simple, routine, 1 to 3-step tasks, and
(h) would not be able to perform work requiring a high rate of
production or close interaction with co-workers.  When asked
whether there were any unskilled jobs that the hypothetical
person could perform, Mr. Mahler answered affirmatively,
identifying the following jobs: hand packer, inspector/checker,
laundry folder and labeler/marker.

ALJ Noon then asked Mr. Mahler to assume a hypothetical
person who (a) had the ability to perform sedentary work, (b)
could stand or walk for 2 hours in an 8-hour workday, but could
not stand or walk for more than 20 minutes before he would have
to sit down for a few minutes, (c) could sit for at least 6 hours
in an 8-hour workday, but would have to change positions every 30
minutes, and (d) had the other limitations set forth in the first
hypothetical question.  When asked whether there were any

_____

work as a welder was heavy, skilled work.  Thus, ALJ Noon found
that plaintiff could not perform his past relevant work.

unskilled jobs that the second hypothetical person could perform, Mr. Mahler answered affirmatively, identifying the following jobs: sorter/grader, inspector/checker, waxer of glass products and assembler/packer.

ALJ Noon then asked Mr. Mahler to assume the limitations set forth in the first hypothetical question but with the additional limitation that the person would be off task due to his impairments for 2 hours out of an 8-hour workday.  When asked if there were any full-time, unskilled jobs that this hypothetical person could perform, Mr. Mahler testified that the additional limitation would preclude sustained competitive employment because an employee is required to be on task for 85 to 90 percent of the workday.

Finally, ALJ Noon asked Mr. Mahler to assume that, rather than being off task, the hypothetical person would miss 3 days of work a month due to his impairments.  When asked whether there were any full-time, unskilled jobs that this hypothetical person could perform, Mr. Mahler testified that there would be no such jobs in the local or national economy.  (R. 869-74).

### D. Medical Evidence

The administrative record in this case includes the following medical evidence:

**1. Records of The Washington Hospital - 4/5/93 to 6/11/93**

Plaintiff was treated in the emergency department of The
Washington Hospital on April 5, 1993 for injuries sustained by
plaintiff when he hit his head on the ceiling of a bus during the
mine accident.  Plaintiff was diagnosed with cervical and dorsal
strain, and he was instructed to follow-up the next day with the
hospital's Occupational Medicine Center ("OMC").  (R. 136, 148).

When plaintiff presented to the OMC on April 6, 1993, he
complained of "left-sided neck pain with radiation toward the
left scalp and also some pain radiating toward the left dorsal
spine," as well as "a vague feeling of numbness in his left arm
without any true loss of power or any true radicular pain."
Plaintiff's examination revealed limited range of motion in his
cervical spine and tenderness on the left side of the cervical
spine.  X-rays of plaintiff's cervical and thoracic spines were
negative.  The assessment was cervical and dorsal spine strain.
Motrin and Flexeril were prescribed for plaintiff and he was
instructed to apply moist heat to the affected areas.  In the
record of this visit, Dr. Cullen indicates that plaintiff was fit
for light duty with no overhead work, lifting or bending.  (R.
136, 147).

Plaintiff returned to the OMC for a follow-up visit on April
13, 1993.  Plaintiff continued to complain of left-sided
headaches, pain along the left cervical area, aching in the left

arm and intermittent numbness and tingling.  Although "somewhat improved," plaintiff's range of motion in his cervical spine continued to be decreased, and he had tenderness over the left paracervicals from C3 through T1 or T2.  Plaintiff's strength was normal in all muscle groups in both arms, his sensation was normal and his reflexes were symmetrical.  The assessment was cervical spine strain with questionable nerve root impingement.  Plaintiff's medications were adjusted, and he was instructed to undergo physical therapy three times a week, including moist heat, ultrasound and cervical traction.  In the record of this visit, Dr. Cullen indicates that plaintiff was "still fit" for light duty work with the same restrictions.  (R. 134-35, 145-46).

Plaintiff returned to the OMC for a follow-up visit on April 22, 1993.  Plaintiff noted complete relief of arm pain since he began receiving cervical traction, but a worsening of his neck pain.  The assessment was cervical spine strain with resolution of nerve root irritation symptoms.  Plaintiff was instructed to continue his prescribed medications and physical therapy.  With respect to Dr. Cullen's opinion that plaintiff was fit for light duty work, plaintiff reported that the mine did not have any light duty work available.  (R. 132-33, 144).

Plaintiff returned to the OMC for a follow-up visit on April 30, 1993.  Plaintiff reported that his neck pain had improved significantly and that he no longer had arm symptoms.  However,

21

plaintiff complained of sharp and persistent pain in his thoracic spine as a result of undergoing chiropractic manipulations several days earlier.  The assessment was cervical spine strain improved.  (R. 130-31, 149).

Plaintiff attempted to return to work in the mine on May 3, 1993.  After dragging some cables, however, he became symptomatic with an increase in pain in the low cervical and thoracic spines and aching along the entire left triceps area.  On May 4, 1993, plaintiff was treated in the emergency department of The Washington Hospital and instructed to follow-up with the OMC the next day.

Plaintiff's examination on May 5, 1993 revealed tenderness in the cervical and thoracic spines and decreased sensation in the 4th and 5th fingers of the left hand.  The assessment was strain of the left cervical spine with questionable nerve root irritation along the ulnar distribution of the left side, and plaintiff's medications were adjusted.  The record indicates that although plaintiff could perform light duty work, he would be taken off work at that time because he was being sent to Dr. Erhard at Laurel Rehab for evaluation and physical therapy.  (R. 128-29, 141-43).

Plaintiff returned to the OMC for a follow-up visit on May 18, 1993.  Plaintiff reported that his arm symptoms had resolved; however, he was left with a mild residual ulnar nerve dysesthesia

in his left hand and tightness, spasm and pain in his left scapula.  Plaintiff's examination revealed that the range of motion in his cervical spine was still limited, and the assessment was cervical spine strain with nerve root irritation symptoms which were resolving in the dorsal spine and rhomboideus strain with trigger areas.  At the request of Dr. Erhard, two trigger point injections were administered to plaintiff.  He was instructed to follow-up with Dr. Erhard and to continue physical therapy.  In the record of this visit, Dr. Cullen indicates again that plaintiff was fit for light duty work.  (R. 126-27).

Plaintiff returned to the OMC for a follow-up visit on May 28, 1993.  Plaintiff reported continued pain in the thoracic spine, an occasional aching sensation in his left upper arm and limitation in the range of motion of his cervical spine.  The assessment was cervical spine strain with possible radicular symptoms and musculoskeletal back pain.[17]  (R. 124-25, 140).

Plaintiff returned to the OMC for a follow-up visit on June 11, 1993.  Plaintiff reported that his neck was feeling better, although he continued to have pain in his mid back and upper lower back, and that Dr. Erhard had been adjusting him several

---

[17]The record of this visit indicates that the results of an MRI of plaintiff's cervical spine to be performed on June 3, 1993 would be reviewed, and, if negative, plaintiff would be referred for "aggressive PT, work hardening."  (R. 124).  In a letter dated July 15, 1993, Dr. Cullen noted that plaintiff underwent MRIs of his neck and dorsal spine on June 3, 1993 at Uniontown Hospital, and that both MRIs were normal.  (R. 159).

times weekly.  Plaintiff's forward flexion was limited to 75 degrees, and he had tenderness in the parascapular area on both sides and in the upper lumbar area of the left side.  The assessment was cervical spine and mid back strain, and plaintiff was instructed to commence a work hardening program at Laurel Rehab on a daily basis.  The record of this visit indicates that plaintiff was to follow-up in two weeks, and that, hopefully, plaintiff would return to work shortly thereafter.  (R. 122-23, 139).

Plaintiff returned to the OMC on July 12, 1993 for a follow-up visit.  Plaintiff reported that although his neck pain was tolerable, he suffered from constant aching in the mid back area and the left shoulder and upper arm.  Plaintiff also reported that he was receiving no benefit from the physical therapy.  (R. 121).

### 2. Functional Capacity Evaluation – 7/7/93

Dr. Cullen referred plaintiff to the Occupational Rehabilitation Center of The Washington Hospital for a functional capacity evaluation, which was performed on July 7, 1993. Regarding plaintiff's cooperation, the evaluator reported that although plaintiff allowed himself to be tested in all test sections, plaintiff indicated that Dr. Mitchell had advised him

"not to lift anything."[18]  As to consistency of performance, the evaluator reported that plaintiff consistently stopped his efforts at a maximum lifting of 20 pounds during two material handling activities.  The evaluator also reported that plaintiff tested positive for symptom magnification behavior on 2 out of 5 objective tests and 10 out of 13 placebo tests, and the evaluator declined to make any recommendations.  (R. 151-58).

### 3. Report of Paul T. Cullen, M.D. - 7/15/93

On July 15, 1993, Dr. Cullen wrote a letter to plaintiff's employer, U.S. Steel Mining Company, in which he described his treatment of plaintiff for the injuries sustained in the April 5, 1993 mine accident.  Dr. Cullen noted that following completion of a work hardening program, Dr. Erhard had considered plaintiff sufficiently improved to return to work near the end of June, 1993, but that plaintiff had commenced treatment with Dr. Mitchell who had advised plaintiff "not to lift anything" during a functional capacity evaluation on July 7, 1993.  Dr. Cullen also noted that plaintiff "is prone to being intermittently depressed but that this has not been increasing in severity."  In conclusion, Dr. Cullen stated:

> "At the present time this patient is 3½ months post injury and has had extensive testing including x-rays, MRI

---

[18]By this time, plaintiff had switched his care to Dr. Mitchell, an orthopedic specialist, and he was undergoing physical therapy at Physio Associates, Ltd., which is affiliated with Dr. Mitchell and adjacent to his office.  (R. 151, 821-23).

scans and he has been treated with months of physical
therapy and work hardening therapy.  His complaints remain
symptoms of pain.  There are no objective findings of
abnormality on any of the examinations that have been
performed.  His symptom magnification battery is positive
and it is my opinion that this man does not have any
significant problems that are limiting his physical ability.
It is my opinion that this man is not suffering from any
physical impairment that would prohibit him from returning
to his job and I think he should return to his job in its
full capacity effective 07/15/93.  I also do not think that
there would be any benefit from continuing modalities of
physical therapy since he has had an extensive trial of this
without any benefit."

(R. 159-60).

### 4. Records of William J. Mitchell, M.D. - 6/25/93 to 4/18/95

The records of Dr. Mitchell, an orthopedic specialist,
indicate that he began treating plaintiff for the injuries
sustained in the April 5, 1993 mine accident on June 25, 1993.
During his initial appointment with Dr. Mitchell, plaintiff
complained of a constant, deep aching pain in his neck, sharp
pain in the left side of his head and neck with certain
movements, numbness in his left arm and fingers, frequent
headaches and aching pain in the thoracic area which often
produced a "stinging" sensation.  (R. 105).  Between February
1994 and April 1995, the records show that plaintiff was treated
by Dr. Mitchell on a monthly basis for diagnoses of myofascial
pain syndrome and cervical radiculopathy.[19]  With respect to

---

[19]The record does not contain any office notes of Dr.
Mitchell between plaintiff's initial visit on June 25, 1993 and
his visit on February 3, 1994.  However, there are records
showing that plaintiff received physical therapy at Physio

plaintiff's ability to return to work, Dr. Mitchell consistently opined that plaintiff was disabled.[20]  (R. 103-20).

### 5. Records of Physio Associates, Ltd. - 6/25/93 to 10/11/94

On June 25, 1993, Dr. Mitchell referred plaintiff to Physio Associates Ltd. ("Physio Associates") for physical therapy consisting of moist heat and ultrasound (3x/week for 3 weeks and 2x/week for 4 weeks).  Following plaintiff's initial evaluation, the therapist noted that plaintiff also would be treated with gentle myofascial release techniques to the thoracic and trapezius musculature, and that he would be instructed in proper rest positions and pain avoidance techniques to be utilized at home.  (R. 211).

Between June 28, 1993 and August 2, 1993, plaintiff was treated at Physio Associates on 12 occasions.  During a re-evaluation on August 4, 1993, the therapist noted that although there had been some reduction in plaintiff's symptoms, he continued to have symptoms in the mid-thoracic area particularly on the left.  (R. 209-10).

---

Associates, Ltd., which, as noted in footnote 18, is affiliated with Dr. Mitchell, during this time period.

[20]On some occasions, Dr. Mitchell opined that plaintiff was disabled from his own occupation as a coal mine utility man.  (R. 104, 111, 112, 113, 115).  On other occasions, he opined that plaintiff was disabled from all work.  (R. 108, 109, 110).  On still other occasions, he merely opined that plaintiff was disabled without specifying whether he was disabled from his own occupation or from all work.  (R. 116, 117, 118, 119, 120).

Between August 9, 1993 and August 26, 1993, plaintiff was treated at Physio Associates on 6 occasions.  During a re-evaluation on September 1, 1993, the therapist noted that although plaintiff continued to have no range of motion deficits in his cervical spine, lumbar spine and upper extremities, he continued to experience discomfort in the mid-thoracic, lower thoracic and upper lumbar areas.  (R. 208-09).

Between September 8, 1993 and September 13, 1993, plaintiff was treated at Physio Associates on 3 occasions.  During a re-evaluation on September 15, 1993, the therapist noted that the range of motion in plaintiff's cervical spine, lumbar spine and shoulders appeared to be within normal limits.  However, plaintiff reported continued mid-thoracic pain particularly when stretching, reaching forward and slouching in a seated position. The therapist recommended that plaintiff be treated with interferential stimulation to the pain sites in lieu of continued ultrasound, and he asked Dr. Mitchell to advise.  (R. 208).

Between September 20, 1993 and September 28, 1993, plaintiff was treated at Physio Associates on 3 occasions with a new prescription for application of local accupressure to the T8 level on the left, as well as ultrasound.  During a re-evaluation on October 1, 1993, the therapist noted that plaintiff was not tolerant of direct pressure over the T8 level, but was willing to continue "if there is progress to be made," and he asked Dr.

28

Mitchell to advise regarding continuation of the physical therapy program for plaintiff.  (R. 207).

Between October 6, 1993 and October 27, 1993, plaintiff was treated at Physio Associates on 7 occasions.  During a re-evaluation on October 28, 1993, plaintiff continued to complain of pain and the therapist recommended use of interferential stimulation or iontophoresis to the affected area, as well as treadmill walking and conditioning exercises.  The therapist asked Dr. Mitchell to advise regarding initiation of some active thoracic extension exercises for plaintiff.  (R. 206-07).

Between November 9, 1993 and November 23, 1993, plaintiff was treated at Physio Associates on 5 occasions.  During a re-evaluation on December 1, 1993, the therapist noted that plaintiff continued to complain of pain in the thoracic area, and he asked Dr. Mitchell to advise "regarding continuation or alteration of the current program."  (R. 205-06).

Between December 7, 1993 and January 3, 1994, plaintiff was treated at Physio Associates on 6 occasions.  During a re-evaluation on January 3, 1994, the therapist noted that plaintiff continued to complain of facet-type pain at the T8 level, and that repetitive arm activities and overhead reaching aggravated plaintiff's pain "considerably."  The therapist recommended a conditioning program for plaintiff, including strengthening

exercises for his thoracolumbar spine, and he asked Dr. Mitchell to advise.  (R. 205).

Between January 18, 1994 and January 28, 1994, plaintiff was treated at Physio Associates on 3 occasions.  During a re-evaluation on February 1, 1994, plaintiff reported continued pain in the mid to lower thoracic area when reaching forward, pushing and pulling and engaging in repetitive overhead arm movements. The therapist noted that plaintiff may benefit from an isometric/ isotonic thoracic extension type program, and he asked Dr. Mitchell to advise.  (R. 204).

Despite the therapist's recommendation of a new type of program for plaintiff, plaintiff returned to Physio Associates on February 7, 1994 with a new prescription from Dr. Mitchell for the same physical therapy program.  Between February 7, 1994 and February 24, 1994, plaintiff was treated at Physio Associates on 6 occasions.  During a re-evaluation on February 28, 1994, plaintiff exhibited normal ranges of motion in his cervical and lumbar spines, but continued to complain of pain in the thoracic area with some symptoms radiating into the trapezius, lower cervical region and upper lumbar area.  Plaintiff also complained of frequent headaches.  The therapist asked Dr. Mitchell to advise regarding alteration or continuation of plaintiff's physical therapy program.  (R. 203-04).

Despite the therapist's request for advice concerning the
alteration or continuation of plaintiff's physical therapy
program, plaintiff returned to Physio Associates on March 14,
1994 with a new prescription from Dr. Mitchell for the same
physical therapy program.  Between March 14, 1994 and March 31,
1994, plaintiff was treated at Physio Associates on 6 occasions.
During a re-evaluation on April 4, 1994, the therapist noted that
plaintiff continued to complain of pain in his thoracic area,
although he exhibit normal ranges of motion in his cervical
spine, lumbar spine and arms.  The therapist asked Dr. Mitchell
to advise regarding an increase in the intensity of plaintiff's
current exercise program, as well as continuation of the current
physical therapy program.  (R. 202-03).

Between April 12, 1994 and April 28, 1994, plaintiff was
treated at Physio Associates on 5 occasions.  During a re-
evaluation on May 2, 1994, plaintiff reported continued facet
type pain at the T8 level on the right and mild discomfort at the
L1 level on the left.  The therapist indicated in his notes that
plaintiff may be a candidate for active thoracic extension
activities.  (R. 201-02).

Despite the therapist's indication that plaintiff may be a
candidate for active thoracic extension exercises, plaintiff
returned to Physio Associates on May 9, 1994 with a new
prescription from Dr. Mitchell for the same physical therapy

31

program.  Between May 9, 1994 and May 26, 1994, plaintiff was treated at Physio Associates on 6 occasions.  During a re-evaluation on June 2, 1994, plaintiff reported continued pain in the thoracic spine, as well as radiating symptoms into the ulnar distribution of the left arm, which were aggravated by "very minor routine home duties."  Plaintiff also reported difficulty with sleeping.  The therapist noted that plaintiff's ranges of motion in his cervical spine and arms were normal and his manual muscle testing failed to reveal any gross motor weakness in either arm.  The therapist also noted that plaintiff continued to be a candidate for active thoracic extension exercises and general conditioning, and he asked Dr. Mitchell to advise regarding these recommendations.  (R. 200-01).

Despite the therapist's recommendation to alter plaintiff's physical therapy program following his re-evaluation on June 2, 1994, plaintiff returned to Physio Associates on June 9, 1994 with a new prescription from Dr. Mitchell for the same physical therapy program.  Between June 9, 1994 and July 28, 1994, plaintiff was treated at Physio Associates on 14 occasions. During a re-evaluation on August 1, 1994, plaintiff reported continued pain in the thoracic spine and recent symptoms in the C6 distribution of the left arm.  Plaintiff indicated that his pain decreased when he was inactive at home, but increased significantly when he attempted to perform routine home duties.

The therapist asked Dr. Mitchell to advise regarding continuation of plaintiff's physical therapy program, noting again that plaintiff may be a candidate for some thoracic outlet exercises with resistance.  (R. 198-99).

On August 4, 1994, plaintiff returned to Physio Associates with a new prescription from Dr. Mitchell for thoracic outlet exercises with resistance.  Throughout the exercise program, plaintiff complained of a tingling sensation in the left arm. When plaintiff returned to Physio Associates on August 8, 1994, he reported an aggravation of his pain in the scapular area following the previous physical therapy session.  Despite the increased pain, the therapist encouraged plaintiff to continue with the new activity.  (R. 197).  Between August 4, 1994 and September 1, 1994, plaintiff was treated at Physio Associates on 9 occasions.  During a re-evaluation on September 6, 1994, plaintiff reported continued pain from the current exercise program.  (R. 196-97).

On September 12, 1994, plaintiff returned to Physio Associates with a new prescription from Dr. Mitchell for physical therapy with frequency reduction.  Between September 12, 1994 and September 26, 1994, plaintiff was treated at Physio Associates on 3 occasions.  During a re-evaluation on October 3, 1994, plaintiff reported continued pain in the medial aspect of the scapula and numbness in the ulnar distribution of the left hand.

33

The therapist noted that plaintiff had met one of his physical therapy goals, *i.e.*, tolerance of his current level of exercise, and he recommended progression of plaintiff to the next level of tolerance.  (R. 195-96).

The final record of Physio Associates is dated October 11, 1994 and indicates that Dr. Mitchell had referred plaintiff for a home program.  Plaintiff was given exercise rubber tubing and cuff weights as part of his home program.  (R. 195).

**6. Report of Nerve Conduction Studies - 1/11/94**

Plaintiff underwent nerve conduction studies by Physio Associates on January 11, 1994.  The results were described as "unremarkable."  (R. 164, 213).

**7. Medical Source Statement by William J. Mitchell, M.D. - 7/29/94**

On July 29, 1994, Dr. Mitchell completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities in connection with plaintiff's application for DIB. In the statement, Dr. Mitchell opined that plaintiff could occasionally lift and carry less than 10 pounds; that plaintiff could stand and walk less than 2 hours in an 8-hour workday; that plaintiff must periodically alternate between sitting and standing at intervals not to exceed 30 minutes; that plaintiff's ability to push and pull with his upper extremities was limited; that plaintiff should never balance or crawl; that plaintiff

could only occasionally climb, stoop, kneel and crouch; and that plaintiff's reaching, handling and dexterity were limited.  (R. 184-85).

Dr. Mitchell also indicated that plaintiff suffers from pain in his neck and upper back which is aggravated when he attempts to engage in any activity beyond "moderate activities of daily living;" that plaintiff's sensation, motor power and reflexes were normal and his station and gait were steady; that the range of motion in plaintiff's cervical spine was reduced with pain; that plaintiff did not use an assistive device for ambulation; and that plaintiff's prognosis was fair.  (R. 179-81, 183).

**8. Report of Jonathan M. Szenics, M.D. - 11/16/94**

On November 16, 1994, Dr. Jonathan M. Szenics reviewed the treatment provided to plaintiff by Dr. Mitchell for "reasonableness and necessity" for purposes of plaintiff's continued entitlement to workmen's compensation.  After reviewing the reports of plaintiff's cervical and thoracic MRIs and Dr. Mitchell's office records, Dr. Szenics described his conclusion as follows:

> "Following initial review of record, Dr. Mitchell was
> contacted by telephone on 11/15/94.  During this
> conversation, it was learned that the patient has indeed had
> limited functional improvement; this is partially attributed
> to the lack of available gainful employment.  It appears
> that the social situation and psychosocial environment have
> made it exceedingly difficult to effect appreciable
> improvement in functional status; hence the continued
> disability and resultant medical management.

Regarding treatment from 8/31/93 to the present, it is the
opinion of this reviewer that although such a context may
make occupational rehabilitation difficult, continued
medical evaluation to the frequency of one time per month is
difficult to justify.  It is the experience of this examiner
that a patient with a diagnosis of cervical radiculopathy
and myofascial pain syndrome who is not considered a
surgical candidate and has essentially plateaued from a
rehab standpoint would not need such continued frequency of
medical visits in view of the fact that no appreciable
change in therapeutic regimen is effected.  As such, it is
felt that the care currently rendered is neither medically
reasonable or necessary."

(R. 186-88).

### 9. Report of Vincent A. Smolczynski, P.T. - 12/12/94

On December 12, 1994, Vincent A. Smolczynski, a physical

therapist, reviewed the treatment provided to plaintiff by Physio

Associates for "reasonableness and necessity" for purposes of

plaintiff's continued entitlement to workmen's compensation.

After reviewing the report of plaintiff's initial physical

therapy evaluation, the physical therapy progress notes from June

25, 1993 to October 11, 1994 and the results of the nerve

conduction studies performed on plaintiff on January 11, 1994,

Mr. Smolczynski concluded that the physical therapy services

provided by Physio Associates to plaintiff after August 1, 1994

were neither reasonable nor necessary.  In rendering this

conclusion, Mr. Smolczynski noted that plaintiff's pain was never

qualified or quantified; that without some tool to qualify or

quantify pain, a patient's treatment program is directed simply

by subjective complaints; that assuming plaintiff's injuries were

primarily soft tissue in nature, a reasonable time frame for treatment would be a maximum of 12 to 16 weeks; that the clinical documentation available for review does not demonstrate significant or sustained benefit from services; and that plaintiff appeared to have plateaued somewhere around September 1993. (R. 189-91).

**10. Letter of William J. Mitchell, M.D. - 4/29/96**

On April 29, 1996, Dr. Mitchell sent a letter to plaintiff's counsel in which he summarized the treatment provided to plaintiff in connection with the injuries sustained in the mine accident on April 5, 1993. Dr. Mitchell noted that plaintiff was treated initially with medication. Subsequently, plaintiff was treated with "some structured therapy but it did not help." Plaintiff was then placed on a home exercise program of increasing progression, and he had been seen on a monthly basis since that time for alteration of the home exercise program. Dr. Mitchell indicated that plaintiff's monthly visits demonstrated the persistence of spasm and restricted movement in plaintiff's neck and arms due to repetitive motion which produced pain in the trapezius muscle.[21]  Dr. Mitchell concluded his letter as follows:

---

[21]Dr. Mitchell also indicated that a series of nerve blocks in October 1995 reduced plaintiff's pain level from an 8 to a 4 but only lasted 2½ weeks. Because subsequent attempts did not produce much benefit, this treatment was abandoned.

"Based on the physical findings and several years (sic) observation, it is my opinion that Mr. Patterson exhibits a vertebrogenic disorder in the form of a radiculopathy which is confined to the C5-C6 dermatome on the left.  This has persisted for at least three months despite prescribed therapy, exercises, and medication and is expected to last 12 months with pain, muscle spasm, significant limitation of motion in the neck, and appropriate radicular distribution in the left upper extremity following the C6 nerve root.

It is my opinion that Mr. Patterson remains unable to work on a regular and continuing basis as a result of his problems."

(R. 192-94).

**11. Records of William J. Mitchell, M.D. - 5/21/96 to 12/6/01**

Dr. Mitchell's records indicate that he saw plaintiff on a monthly basis between May 21, 1996 and December 6, 2001 for complaints of neck pain, shoulder pain and headaches. Plaintiff's diagnoses continued to be myofascial pain syndrome and cervical radiculopathy, and Dr. Mitchell consistently opined that plaintiff was disabled from work.  (R. 348-71, 488-510, 619-61).

**12. Report of William J. Mitchell, M.D. - 2/9/98**

In a questionnaire completed on February 9, 1998, Dr. Mitchell indicated that he had seen plaintiff on a monthly basis since June 25, 1993, and that he had last seen plaintiff on February 5, 1998.  Dr. Mitchell listed plaintiff's diagnoses as myofascial pain syndrome and cervical radiculopathy, and he indicated that "even simple tasks" increase plaintiff's pain,

limiting him to activities of self care.  Dr. Mitchell also
indicated that plaintiff's cervical range of motion was limited
with pain, but that his sensation, motor power and reflexes were
normal and his gait and station were steady.  According to Dr.
Mitchell, plaintiff did not need an assistive device to ambulate
and his prognosis was fair.  (R. 343-45).

In a Medical Source Statement of Claimant's Ability to
Perform Work-Related Physical Activities, Dr. Mitchell indicated
that plaintiff could not engage in lifting activities; that
plaintiff could stand and walk less than 2 hours in an 8-hour
workday; that plaintiff must alternate between sitting and
standing every 15 to 30 minutes; that plaintiff's ability to push
and pull with his upper extremities was limited; that plaintiff
could never climb, balance, stoop, crouch or crawl and only
occasionally kneel; and that plaintiff had limitations with
respect to reaching, handling and dexterity.  (R. 346-47).

### 13. Letter of Cecelia Buseck, M.S. - 11/6/98

On November 6, 1998, Cecelia Buseck, M.S. of Chestnut Ridge
Counseling Services, Inc. ("CRCSI") wrote a letter to plaintiff's
attorney which, in summary, states:

Based on a recommendation from Dr. Mitchell due to an
increase in plaintiff's depression over the previous few months,
plaintiff initially was seen at CRCSI on May 21, 1998.  During
the intake interview, plaintiff reported "feeling stressed out

39

and depressed all the time" due to the dramatic change in his
lifestyle as a result of the back injury he sustained in the mine
accident on April 5, 1993, *i.e.*, an inability to do anything
around the house, an inability to maintain a job to support his
family and an inability to even pick up his grandchildren when
they visit.

Plaintiff was first seen by Ms. Buseck for individual
therapy on June 12, 1998.  Since that time, Ms. Buseck has seen
plaintiff twice a month for increased symptoms of anxiety,
nervousness and some obsessive compulsive behaviors due to
"ongoing worries over his inability to work."[22]  It was the
intent of Ms. Buseck to schedule an appointment for plaintiff
with CRCSI's psychiatrist for an evaluation and possible
medication.  (R. 380-81).

### 14. Report of William J. Mitchell, M.D. - 4/8/99

In a questionnaire completed on April 8, 1999, Dr. Mitchell
indicated that he had seen plaintiff on a monthly basis since
June 25, 1993, and that he had last seen plaintiff on March 4,
1999.  Dr. Mitchell listed plaintiff's diagnoses as myofascial

_____

[22]The notes of Ms. Buseck which are in the administrative
record indicate that she saw plaintiff at CRCSI for individual
therapy in connection with his depression on the following dates:
June 12, 1998, June 30, 1998, August 4, 1998, August 25, 1998,
September 29, 1998, November 16, 1998, February 9, 1999, March 2,
1999, March 23, 1999, May 4, 1999, June 15, 1999, July 13, 1999,
August 10, 1999, September 10, 1999, February 7, 2000, March 16,
2000, April 13, 2000, May 2, 2000 and July 11, 2000.  (R. 433-41,
482-87, 610, 613, 616-17).

pain syndrome and cervical radiculopathy, and he indicated that "all activities" increase plaintiff's pain, limiting him to activities of self care.  Dr. Mitchell also indicated that plaintiff's cervical range of motion was limited and his gait was slow, but that his sensation, motor power and reflexes were normal.  According to Dr. Mitchell, plaintiff did not need an assistive device to ambulate and his prognosis was fair.  (R. 442-44).

In a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities, Dr. Mitchell indicated that plaintiff could not lift or carry any amount of weight; that plaintiff was limited to standing and walking 1 hour or less in an 8-hour workday; that plaintiff was limited to sitting 1 hour in an 8-hour workday; that plaintiff's ability to push and pull with his upper extremities was limited; that plaintiff could never bend, stoop, crouch, balance or climb and only occasionally kneel; that plaintiff had limitations with respect to reaching, handling and dexterity; and that plaintiff should avoid wetness and humidity.  (R. 445-46).

**15. Report of Frank J. Provenzano, Ph.D. - 6/4/99**

On May 27, 1999, plaintiff underwent a consultative psychological evaluation by Frank J. Provenzano, Ph.D., at the request of the Pennsylvania Bureau of Disability Determination to assess his complaints of depression and anxiety.  In his report

of the evaluation which is dated June 4, 1999, Dr. Provenzano noted that plaintiff was given a standard mental status exam and an extended clinical interview.  In addition, Dr. Provenzano reviewed records that had been provided to him by the Pennsylvania Bureau of Disability Determination.

During the evaluation, plaintiff displayed no overt signs of resistance and his rapport with the evaluator was described as good.  Dr. Provenzano noted that plaintiff had some difficulty standing and sitting; that he did so slowly; and that, although he was able to walk unaided, his gait was unsteady.  Dr. Provenzano also noted that plaintiff described himself as "significantly depressed," and that plaintiff's mood "did have a dysthymic quality to it in presentation."  Dr. Provenzano stated that he thought plaintiff "was reliable and honest in his presentation," and he diagnosed plaintiff as suffering from major depression, single episode, an anxiety disorder, NOS and chronic back pain.  Dr. Provenzano rated plaintiff's score on the Global Assessment of Functioning Scale as a 50.[23]  (R. 447-53).

---

[23]The Global Assessment of Functioning (GAF) Scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health - illness.  The highest possible score is 100, and the lowest is 1.  GAF scores from 41 to 50 denote **serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of Mental Disorders (DSM IV), at 30-32 (bold face in original).

Dr. Provenzano also completed a Psychiatric Activities Assessment for plaintiff.  With respect to activities of daily living, Dr. Provenzano indicated that plaintiff was limited in his ability to clean, shop and cook due to pain; that he was unable to maintain a residence; but that he was capable of paying bills and taking care of his grooming and personal hygiene.  As to social functioning, Dr. Provenzano indicated that plaintiff was capable and appropriate.  Turning to concentration and task persistence, Dr. Provenzano indicated that plaintiff's ability to carry out instructions was limited by his physical problems which cause concentration and short term memory issues; that plaintiff was unable to perform activities within a schedule, attend to a task from beginning to end and sustain a routine for the same reason; and that plaintiff was unable to perform at a consistent pace because he needed frequent rest stops and reminders. Finally, regarding adaptation to stressful situations, Dr. Provenzano indicated that plaintiff would have difficulty adapting to changes; that he would be unable to respond appropriately to deadlines or schedules; that he would withdraw if presented with conflict; and that he would be unable to maintain regular attendance.  (R. 454-57).

**16. Psychiatric Review Technique Form - 6/15/99**

On June 15, 1999, a Psychiatric Review Technique Form was completed by a non-treating, non-examining physician in

43

connection with plaintiff's application for DIB.  Under the
section relating to Affective Disorders (Listing 12.04), the
physician indicated that plaintiff suffers from a depressive
syndrome characterized by the following: (1) psychomotor
agitation or retardation; (2) decreased energy; (3) feelings of
guilt or worthlessness; and (4) difficulty concentrating or
thinking.  With respect to the degree of limitation resulting
from plaintiff's mental impairment, the examiner indicated that
plaintiff had a slight restriction of activities of daily living
and slight difficulty in maintaining social functioning; that
plaintiff often experienced deficiencies of concentration,
persistence or pace resulting in failure to complete tasks in a
timely manner; and that plaintiff never had an episode of
deterioration or decompensation in a work or work-like setting.
(R. 458-66).

### 17. Mental Residual Functional Capacity Assessment - 6/15/99

In a Mental Residual Functional Capacity Assessment
completed by a non-treating, non-examining physician on June 15,
1999 in connection with plaintiff's application for DIB, the
physician indicated that plaintiff was "moderately" limited in
the following areas: (1) the ability to maintain attention and
concentration for extended periods; (2) the ability to perform
activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances; and (3) the ability to

complete a normal workday and workweek without interruptions from
psychologically based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest periods.
(R. 467-70).

## 18. Physical Residual Functional Capacity Assessment - 6/21/99

In a Physical Residual Functional Capacity Assessment
completed by a non-treating, non-examining physician on June 21,
1999 in connection with plaintiff's application for DIB, the
physician did not complete the sections of the form relating to
the exertional, postural or environmental limitations resulting
from plaintiff's back pain.  However, in his notes, the physician
stated that plaintiff's complaints of pain were not fully
credible because there are no significant objective findings.
(R. 471-78).

## 19. Report of Jaime Lievano, M.D. - 7/15/99

On July 15, 1999, plaintiff underwent a psychiatric
evaluation by Dr. Jaime Lievano of CRCSI.  With respect to
plaintiff's mental status examination, Dr. Lievano noted that
plaintiff was very pleasant, cooperative, attentive and
interested in the examination; that plaintiff's behavior was
appropriate and his speech was normal and relaxed; that his mood
was depressed with a constricted affect; that he had some
difficulties with recent memory; that his intelligence was in the

upper average range with good judgment; and that his
concentration was poor.

Dr. Lievano's diagnoses included (1) major depressive
disorder, single episode; (2) obsessive compulsive disorder; (3)
history of alcohol dependence, in remission; and (4) injury to
back and neck.  Dr. Lievano rated plaintiff's GAF score as a 49,
and she recommended that plaintiff continue psychotherapy for
depression and obsessive compulsive disorder.  Dr. Lievano
prescribed Luvox for plaintiff and scheduled a medication check
for July 29, 1999.  (R. 479-81).

**20. Progress Notes of Syed F. Alam, M.D. - 2/15/00 and
3/27/00**

On February 15, 2000, plaintiff saw Dr. Alam for a follow-up
visit at CRCSI.  At that time, plaintiff reported that he had
stopped taking the Luvox prescribed by Dr. Lievano because he
developed severe headaches from the medication.  Following a
mental status examination, Dr. Alam diagnosed plaintiff as
suffering from an adjustment disorder with depressed mood, an
obsessive compulsive disorder, a history of alcohol dependence in
remission and an injury to his neck and back, and he rated
plaintiff's GAF score as a 50.  Dr. Alam initiated a trial of
Paxil for plaintiff and advised him to continue individual
psychotherapy with Ms. Buseck.  (R. 611-12).

Plaintiff was seen by Dr. Alam for a medication check on March 27, 2000.  Plaintiff reported that he had been feeling calmer, more relaxed and less depressed since taking the Paxil. He also reported that he had been experiencing less obsessive compulsive behavior, and that he had been sleeping better.  (R. 614-15).

**21. Deposition of Frank J. Provenzano, Ph.D. - 9/29/00**

On September 29, 2000, Dr. Provenzano's deposition was taken in connection with plaintiff's claim against U.S. Steel Mining Company for workmen's compensation.[24]  With respect to his consultative psychological evaluation of plaintiff on May 27, 1999, Dr. Provenzano testified that he did not find any malingering on plaintiff's part and that he "felt [plaintiff] was pretty genuine in his expression of pain."  As to plaintiff's ability to work in light of his mental impairments, Dr. Provenzano testified as follows:

\*   \*   \*

Q.  Doctor, did you arrive at an opinion within a reasonable degree of medical certainty as to whether or not

---

[24]During the supplemental hearing before ALJ Alexander on January 31, 2002, plaintiff testified that the attorney who represented him in connection with his workmen's compensation case deposed Dr. Provenzano based on the report he had prepared following his consultative psychological evaluation of plaintiff on May 27, 1999, which was conducted at the request of the Pennsylvania Bureau of Disability Determination.  Approximately a year before the supplemental hearing, plaintiff resolved his workmen's compensation case for a lump sum payment.  (R. 531-32).

you believed based on Mr. Patterson's mental status alone
whether or not he could perform any work?

     A.  At the time that I saw him I did not feel that he
would have been functional at a GAF of fifty.  That's pretty
limited.

     Q.  Would that apply to any type of work?

     A.  At that time, yes.

                         *    *    *

(R. 560-609).

### 22. Report of L. Leon Reid, Ph.D. - 10/25/04

In a report dated October 25, 2004, Dr. Reid summarized the

treatment received by plaintiff for his physical and mental

impairments.  Dr. Reid then expressed his disagreement with the

GAF scores assigned to plaintiff by Ms. Buseck (50), Dr. Lievano

(49) and Dr. Alam (50), concluding that the record suggested a

GAF score of 60.[25]  Dr. Reid also concluded that,

"[p]sychologically, this Claimant would best been (sic) placed in

a job that respects his physical impairments, in a job that has a

sit/stand option, where the work tasks are routine and

repetitive, and where the pace is non-competitive.  Finally, Dr.

Reid noted that the Minnesota Multiphasic Personality Inventory -

_____

     [25]GAF scores from 51 to 60 denote **moderate symptoms** (e.g.,
flat affect and circumstantial speech, or occasional panic
attacks) **OR moderate difficulty in social, occupational, or
school functioning** (e.g., few friends or conflict with peers or
co-workers).  Diagnostic and Statistical Manual of Mental
Disorders (DSM IV), at 30-32 (bold face in original).

                              48

II ("MMPI-II") test should have been administered to plaintiff, as well as the Battery on Health Improvement test which would have provided a pain level score and assisted in a psychological understanding of plaintiff's case.  (R. 748-52).

**23. Report of Frank Schmidt, Ph.D. - 12/27/04**

On December 20, 2004, following the initial hearing before ALJ Noon, Frank K. Schmidt, Ph.D. administered the Wechsler Adult Intelligence Scale - III ("WAIS-III") and the MMPI-II tests to plaintiff.  With respect to the WAIS-III, Dr. Schmidt reported that plaintiff's Full Scale IQ was 93, placing him in the lower half of the average range.  As to the MMPI-II, Dr. Schmidt reported that plaintiff "appear[ed] to be in genuine emotional distress concerning his physical conditions and his energy level [was] seen as low."  Dr. Schmidt indicated that the diagnoses suggested by plaintiff's MMPI-II clinical profile elevations were "borderline personality disorder (301.83), adjustment disorder with mixed anxiety and depressed mood (309.28), and chronic pain disorder (307.89), incidental to the lumbar injuries incurred in a bus accident in a coal mine."  (R. 753-57).

Following his testing of plaintiff, Dr. Schmidt completed a Medical Source Statement of Ability To Do Work-Related Activity (Mental) for plaintiff.  With respect to the ability to understand, remember and carry out instructions, Dr. Schmidt indicated that plaintiff's mental impairments result in a

49

"marked" limitation in his ability to carry out both short, simple instructions and detailed instructions due to increased pain.  (R. 758-63).

### 24. Report of L. Leon Reid, Ph.D. - 5/6/05

On May 6, 2005, Dr. Reid prepared a further report following his review of Dr. Schmidt's test findings.  As to Dr. Schmidt's finding that plaintiff had "marked" limitations in carrying out instructions, Dr. Reid noted that Dr. Schmidt emphasized the pain factor in rendering these findings and Dr. Mitchell's report noted that plaintiff's pain symptoms were controlled as long as he does not bend or lift.  Turning to the MMPI-II, Dr. Reid indicated that the results did not reveal an individual in severe psychological distress.  Dr. Reid concluded his report by stating that although plaintiff had an adjustment disorder resulting from his medical condition, he did not meet or equal any of the listings for mental disorders (12.00).[26]  (R. 764-65).

### III.  Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a

---

[26]As noted previously, this latter opinion conflicts with the testimony provided by Dr. Reid at the May 25, 2005 hearing before ALJ Noon.  Specifically, Dr. Reid testified that plaintiff's mental impairments equaled Listing 12.06 as of February 15, 2000.

civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

### B. The 5-Step Sequential Evaluation Process

In Burnett v. Commissioner of Social Security Admin., 220 F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure an ALJ must follow in evaluating a claim for Social Security disability benefits, stating in relevant part:

*     *     *

In Plummer, we recounted the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial

51

gainful activity, the disability claim will be denied. <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987).  In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(d).  If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.  Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The claimant bears the burden of demonstrating an inability to return to her past relevant work.  <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step.  At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f).  The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity.  The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

<u>Plummer</u>, 186 F.3d at 428.

*   *   *

220 F.3d at 118-19.

With respect to ALJ Noon's application of the five-step sequential evaluation process in the present case, steps one and

two were resolved in plaintiff's favor: that is, ALJ Noon found
that plaintiff had not engaged in substantial gainful activity
since his alleged onset date of disability, and that plaintiff
suffers from chronic cervical and thoracic strain and a major
depressive disorder, impairments which are severe within the
meaning of the Social Security Regulations.  (R. 670-72).
Turning to step three, ALJ Noon found that plaintiff's
impairments were not sufficiently severe to meet or equal the
requirements of any impairment listed in Section 1.00 or Section
12.00 of Part 404, Subpart P, Appendix 1 of the Social Security
Regulations, relating to the musculoskeletal system and mental
disorders, respectively.  (R. 672-75).  As to step four, ALJ Noon
found that plaintiff cannot perform his past relevant work as a
coal miner or welder in light of his RFC.  (R. 682).  Finally,
regarding step five, based on the testimony of the vocational
expert, ALJ Noon found that, considering plaintiff's age,
education, past work experience and RFC, there were a significant
number of jobs in the national economy which plaintiff could
perform, including the jobs of sorter/grader, inspector/checker
and waxer of glass products.  (R. 682-83).

### C. Discussion

Plaintiff raises three arguments in support of his motion
for summary judgment.  First, plaintiff asserts that ALJ Noon
failed to properly evaluate his mental impairments.  Second,

plaintiff asserts that ALJ Noon failed to give appropriate weight to the opinions of his treating physicians.  Third, plaintiff asserts that ALJ Noon failed to give appropriate weight to the opinion of the medical expert regarding medical equivalence. After consideration, the Court concludes that substantial evidence supports ALJ Noon's decision that plaintiff was not disabled under the Social Security Act at any time before the expiration of his insured status on June 30, 1999.

i

Turning first to ALJ Noon's alleged failure to give appropriate weight to the opinions of plaintiff's treating physicians, Dr. Mitchell and Dr. Lievano, in Morales v. Apfel, 225 F.3d 310 (3rd Cir.2000), the Third Circuit discussed the issue of the weight to be accorded treating physicians' opinions, stating:

*   *   *

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Plummer, 186 F.3d at 429 (quoting Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir.1987)); *see also* Adorno v. Shalala, 40 F.3d 43, 47 (3d Cir.1995); Jones, 954 F.2d at 128; Allen v. Bowen, 881 F.2d 37, 40-41 (3d Cir.1989); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir.1988); Brewster, 786 F.2d at 585.  Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." Plummer, 186 F.3d at 429 (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir.1993)).  The ALJ must consider the

54

medical findings that support a treating physician's opinion
that the claimant is disabled. *See* <u>Adorno</u>, 40 F.3d at 48.
In choosing to reject the treating physician's assessment,
an ALJ may not make "speculative inferences from medical
reports" and may reject "a treating physician's opinion
outright only on the basis of contradictory medical
evidence" and not due to his or her own credibility
judgments, speculation or lay opinion." <u>Plummer</u>, 186 F.3d
at 429; <u>Frankenfield v. Bowen</u>, 861 F.2d 405, 408 (3d Cir.
1988); <u>Kent</u>, 710 F.2d at 115.

*   *   *

225 F.3d at 317-18.

With respect to ALJ Noon's rejection of Dr. Mitchell's
opinion that plaintiff is disabled by his physical impairments,
plaintiff notes that Dr. Mitchell is an orthopedic physician
whose opinion is based on "his continuing observation of
[plaintiff] over a prolonged period of time," and plaintiff
asserts that "[t]here is no physician who has been involved, even
for a day, in [his] treatment who has gainsaid Dr. Mitchell's
opinion." (Document No. 13, p. 13). While there is no dispute
that Dr. Mitchell is an orthopedic specialist who has treated
plaintiff over a long period of time, plaintiff's assertion that
no other treating physician has ever contradicted Dr. Mitchell's
opinion simply is incorrect. As noted by ALJ Noon, Dr. Cullen,
the physician who initially treated plaintiff for the cervical
and thoracic spine injuries he sustained in the mine accident on
April 5, 1993, opined in a letter dated July 15, 1993 that
plaintiff "does not have any significant problems that are
limiting his physical ability." (R. 679). In any event, ALJ

55

Noon complied with the standard enunciated in Morales, *supra*, discussing at length the evidence in the record on which he relied to reject Dr. Mitchell's opinion that plaintiff is disabled from all gainful activity.  Specifically, ALJ Noon noted that (a) all of plaintiff's diagnostic tests, including x-rays (4/93), MRIs (6/93) and nerve conduction studies (1/94), were normal or unremarkable (R. 671, 672, 676-77, 680); (b) in July, 1993, plaintiff underwent a functional capacity evaluation which resulted in no recommendations because plaintiff was reported to have been "guarded and self-limiting in his behavior" and he tested positive for symptom magnification (R. 679); (c) Dr. Szenics, who reviewed the treatment provided to plaintiff by Dr. Mitchell in November 1994, opined that monthly treatment was neither medically reasonable nor medically necessary, noting that Dr. Mitchell had informed him that plaintiff's limited functional improvement was partially attributable to the lack of available gainful employment (R. 680); (d) Dr. Mitchell repeatedly reported that plaintiff's neurological examinations were normal, his station and gait were normal and he did not require an assistive device to ambulate (R. 677-78, 680); (e) despite the alleged severity of plaintiff's physical impairments, Dr. Mitchell never referred plaintiff for further diagnostic studies or to a neurologist and Dr. Mitchell's reports contain no mention of possible surgery (R. 680); and (f) the drastic limitations

reported by Dr. Mitchell in his April 8, 1999 assessment of plaintiff's ability to perform physical work-related activities, which was the last assessment completed by Dr. Mitchell before the expiration of plaintiff's insured status, were inconsistent with plaintiff's daily activities (R. 680).  Based on the foregoing, ALJ Noon's rejection of Dr. Mitchell's opinion that plaintiff is disabled by his physical impairments is supported by substantial evidence.

Turning to Dr. Lievano, the record does not support plaintiff's claim that Dr. Lievano was a treating physician whose opinion was entitled to great weight.  In fact, plaintiff's first and, based on the record, only contact with Dr. Lievano occurred on July 15, 1999, after the expiration of his insured status.[27] Moreover, in her report of plaintiff's psychiatric evaluation, Dr. Lievano did not render an opinion concerning plaintiff's ability to engage in substantial gainful activity.  Rather, Dr. Lievano diagnosed plaintiff as suffering from major depression and obsessive compulsive disorder and rated plaintiff's GAF score as a 49, which, as noted in footnote 23, denotes **serious** symptoms.  In his decision, ALJ Noon adequately explained his

---

[27]The notes of plaintiff's therapist at CRCSI indicate that Dr. Lievano left the clinic after her psychiatric evaluation of plaintiff on July 15, 1999 (R. 610), and the notes of Dr. Syed F. Alam, the CRCSI psychiatrist to whom plaintiff was referred for medication in February 2000, indicate that plaintiff had not seen another psychiatrist since his evaluation by Dr. Lievano on July 15, 1999.  (R. 611).

reasons for rejecting the GAF score assigned to plaintiff by Dr. Lievano, concluding that the record supported a finding that plaintiff's mental impairments before the expiration of his insured status resulted in **moderate**, rather than **serious**, symptoms based on Dr. Lievano's report of plaintiff's mental status examination.[28]  In addition, ALJ Noon noted that his rejection of a GAF score of 49 was supported by the October 25, 2004 report of the medical expert, Dr. Reid, who indicated that the results of plaintiff's mental status examinations by the various mental health professionals which were in the record suggested a GAF score of 60 which denotes **moderate** symptoms.  (R. 681).  Under the circumstances, ALJ Noon's rejection of the GAF score assigned to plaintiff by Dr. Lievano is supported by substantial evidence.

---

[28]With respect to plaintiff's mental status examination by Dr. Lievano on July 15, 1999, she noted the following: (a) plaintiff was very pleasant, (b) plaintiff came into the examination willingly, (c) plaintiff was cooperative, attentive and interested in the examination, (d) plaintiff's behavior was appropriate for the circumstances (e) plaintiff's speech was normal and relaxed, (f) although plaintiff's mood was depressed with constricted affect, there was no evidence of delusions or hallucinations, (g) plaintiff's thought processes were goal directed without flight of ideas or loose associations, (h) although plaintiff had some difficulty with recent memory, his intelligence was in the upper average range with good judgment, (i) plaintiff's concentration was poor, although he admitted that the reason was sometimes attributable to not paying attention or not caring to remember things, (j) plaintiff did well with serial sevens, and (k) plaintiff was oriented to time, place, person and situation.  (R. 480-81).

ii

With regard to ALJ Noon's alleged failure to properly evaluate plaintiff's mental impairments, plaintiff asserts that ALJ Noon "deliberately down-played the significance of Dr. Provenzano's opinion," "ignored the opinions of the staff at Chestnut Ridge," and "minimized the testimony of the medical expert." (Document No. 13, p. 11).

Turning first to Dr. Provenzano, plaintiff implies that ALJ Noon should be bound by the opinion of Dr. Provenzano because he performed a consultative psychological examination of plaintiff at the request of the Pennsylvania Bureau of Disability Determination.[29]  However, he has cited no case law to support this position and the Court can find none.  As to Dr. Provenzano's opinion that plaintiff's GAF score was 50 at the time of his psychological evaluation on May 27, 1999, ALJ Noon noted that although plaintiff described himself as significantly depressed, the results of his mental status examination by Dr. Provenzano did not support a finding that plaintiff's depression and anxiety disorder resulted in **serious** symptoms.[30]  In

---

[29]In this connection, plaintiff asserts: "If Provenzano is so faulty in his opinions, why does the Commissioner opt to send claimants to him?  The Commissioner's agents, not Mr. Patterson, selected Provenzano for the consultative examination."  (Document No. 13, p. 11).

[30]Regarding plaintiff's mental status examination, Dr. Provenzano noted in his report that (a) plaintiff made reasonably good eye contact throughout the interview, (b) plaintiff was

addition, ALJ Noon noted that the medical expert, Dr. Reid, reported that the results of plaintiff's various mental status examinations suggested a GAF score of 60 during the relevant time period.  Finally, as to Dr. Provenzano's findings in connection with plaintiff's concentration and task persistence,[31] ALJ Noon noted that the findings were not supported by plaintiff's mental status examination and were based primarily on plaintiff's subjective complaints which ALJ Noon found not fully credible for stated reasons.[32]  (R. 681).

_____

fully cooperative and displayed an accepting attitude, (c) plaintiff was able to converse with ease, (d) plaintiff was able to show a full range of affect which was generally appropriate, (e) plaintiff denied any perceptual disturbances, (f) plaintiff's stream of thought was intact, (g) plaintiff's responses to questions were logical, relevant and goal-directed, (h) plaintiff was not delusional, (i) plaintiff was oriented in all spheres, (j) plaintiff was able to remember events from the remote past without difficulty, (k) plaintiff was able to remember general events of the recent past without difficulty, although he had some problem recalling recent events with any degree of specificity, (l) plaintiff's immediate retention was quite good, (m) there was no indication of impulse control problems, and (n) plaintiff's social and test judgments were adequate.  (R. 449-52).

[31]In a Psychiatric Activities Assessment completed in connection with plaintiff's psychological evaluation on May 27, 1999, Dr. Provenzano opined that plaintiff's ability to carry out instructions was impaired by physical limitations; that plaintiff was unable to perform activities within a schedule, attend to a task from beginning to end and sustain a routine due to fatigue and concentration problems; and that plaintiff was unable to perform at a consistent pace because he requires frequent rests and reminders.  (R. 456).

[32]In this regard, ALJ Noon also noted that his findings concerning plaintiff's mental limitations were consistent with the assessment of a State agency psychological consultant which

With respect to the claim that ALJ Noon ignored the opinions of the "staff" of CRCSI, if plaintiff is referring to Ms. Buseck, his therapist at CRCSI, the Court's review of the record reveals no opinion by Ms. Buseck concerning the effect of plaintiff's mental impairments on his ability to engage in substantial gainful activity and no opinion by Ms. Buseck concerning the functional limitations resulting from plaintiff's mental impairments.[33]  Moreover, as noted by ALJ Noon, Ms. Buseck's individual therapy notes deal "primarily with complaints about not being able to do things, fighting with workers' compensation and Social Security, and concerns for his grandchild," and do not show a severe mental health disorder.  (R. 681).  Regarding Dr. Lievano of CRCSI, a review of Dr. Lievano's report of plaintiff's psychiatric evaluation on July 15, 1999 reveals no opinion concerning plaintiff's ability to engage in substantial gainful activity and, for the reasons set forth in Section III (C)(i) of this Memorandum Opinion, the Court concludes that substantial evidence supports ALJ Noon's rejection of the GAF score assigned to plaintiff by Dr. Lievano following the psychiatric evaluation. Finally, with respect to Dr. Alam, the CRCSI psychiatrist to whom

---

was completed on June 15, 1999.  (R. 681).

[33]With respect to plaintiff's treatment by Ms. Buseck, ALJ Noon noted that plaintiff did not start such treatment until approximately one year before the expiration of his insured status, and there is no record showing that plaintiff was ever treated for depression on an inpatient basis.  (R. 679).

plaintiff was referred for medication following the departure of
Dr. Lievano from CRCSI and the only other medical professional
who appears to have treated plaintiff at CRCSI, Dr. Alam did not
see plaintiff for a consultation until February 15, 2000, 7½
months after the expiration of plaintiff's insured status for
purposes of DIB.  As a result, ALJ Noon did not err by "ignoring"
any medical evidence relating to plaintiff's treatment by Dr.
Alam.

     As to plaintiff's claim that ALJ Noon "minimized" the
testimony of the medical expert, ALJ Noon noted that Dr. Reid
opined that plaintiff's mental impairments equaled Listing 12.06
**if his complaints of pain were assumed to be credible.**  (R. 858).
However, as noted previously, substantial evidence supports ALJ
Noon's finding that plaintiff's complaints regarding the
"intensity, duration and limiting effects" of his pain were not
entirely credible (R. 676), *i.e.*, Dr. Cullen's opinion in July
1993 that plaintiff did not have any significant physical
problems, the unremarkable diagnostic tests and the evidence of
symptom magnification.  Moreover, in determining plaintiff's RFC,
ALJ Noon took into consideration the fact that plaintiff suffered
from a depressive disorder as a result of his physical
limitations, restricting plaintiff to "simple, routine jobs
involving one- to three-step tasks and requiring no high rates of
production, i.e., assembly line work, and no close interaction

with other workers" (R. 675), in accordance with Dr. Reid's testimony during the May 25, 2005 hearing concerning the limitations resulting from plaintiff's mental impairments.  (R. 863-64).  Under the circumstances, plaintiff's assertion that ALJ Noon "minimized" the testimony of Dr. Reid is meritless.

iii

Finally, regarding plaintiff's assertion that ALJ Noon failed to give appropriate weight to the opinion of the medical expert regarding medical equivalence, as noted previously in connection with plaintiff's related argument that ALJ Noon "minimized" the testimony of the medical expert, Dr. Reid testified that plaintiff's mental impairments equaled Listing 12.06 **if his complaints of pain were assumed to be credible**. However, based on substantial evidence of record, ALJ Noon was justified in rejecting plaintiff's complaints of disabling pain, and ALJ Noon adequately accounted for plaintiff's credible complaints in the RFC he attributed to plaintiff, *i.e.*, a limited

range of sedentary work.  Thus, this argument also is unavailing.[34]

_____
                     William L. Standish
               United States District Judge


Date: March  ___, 2007

_____

[34]With respect to the issue of medical equivalence, plaintiff also argues that ALJ Noon "solicited the opinion of the medical expert and then limited it [by inquiring into the date on which medical equivalence was established by the record] because it failed to suit his resolution of the case."  (Document No. 13, p. 15).  After consideration, the Court concludes that this argument also is meritless.  In light of the expiration of plaintiff's insured status on June 30, 1999, almost six years before the final hearing in this case, ALJ Noon would have been remiss if he had failed to ask Dr. Reid to identify the date on which he believed plaintiff's mental impairment equaled a listing for mental disorders under the Social Security Regulations.  There simply was nothing improper about this inquiry.

64

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
STEPHEN D. PATTERSON,          )
                               )
          Plaintiff,           )
                               )
     vs.                       ) Civil Action No. 05-1512
                               )
JO ANNE B. BARNHART,           )
COMMISSIONER OF SOCIAL         )
SECURITY,                      )
                               )
          Defendant.           )
```

ORDER

AND NOW this ___ day of March, 2007, it is hereby ORDERED as follows:

1.  The motion of plaintiff for summary judgment pursuant to Fed.R.Civ.P. 56 (Doc. No. 11) is denied.

2.  The cross-motion of defendant for summary judgment pursuant to Fed.R.Civ.P. 56 (Doc. No. 9) is granted, and the decision of the Commissioner denying plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, is affirmed.

3.  Judgment is entered in favor of defendant and against plaintiff.  The Clerk shall mark this case closed.

_____
        S/William L. Standish
        William L. Standish
     United States District Judge

cc:  Counsel of Record